# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

**19-341**


**STATE OF LOUISIANA**

**VERSUS**

**AARON G. HAUSER**



\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
THIRTY-SIXTH JUDICIAL DISTRICT COURT
PARISH OF BEAUREGARD, NO. CR-548-1983
HONORABLE C. KERRY ANDERSON, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**CANDYCE G. PERRET**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Phyllis M. Keaty, and Candyce G. Perret, Judges.

**REVERSED.**

**James R. Lestage**
**District Attorney**
**Richard A. Morton**
**Assistant District Attorney**
**36th Judicial District**
**124 South Stewart Street**
**DeRidder, LA   70634**
**(337) 463-5578**
**COUNSEL FOR APPELLEE:**
     **State of Louisiana**

**Jill Pasquarella**
**Kristin Wenstrom**
**Hannah Van De Car**
**Louisiana Center for Children's Rights**
**1100-B Milton Street**
**New Orleans, LA   70122**
**(504) 658-6855**
**COUNSEL FOR DEFENDANT/APPELLANT:**
     **Aaron G. Hauser**

**PERRET, Judge.**

Defendant, Aaron Hauser, was indicted on July 19, 1983, for the July 4, 1983 first degree murders of his stepmother, Joan Hauser, and her son, John Leidig, violations of La.R.S. 14:30. He pled guilty to both counts without capital punishment and was sentenced to two concurrent life terms without benefit of parole, probation, or suspension of sentence on April 26, 1984. He now seeks review of the trial court's denial of his motion to correct his illegal sentences pursuant to *Miller v. Alabama*, 567 U.S. 460, 132 S.Ct. 2455 (2012), and *Montgomery v. Louisiana*, __ U.S. __, 136 S.Ct. 718 (2016). For the following reasons, we reverse the trial court judgment upon finding that Defendant has provided sufficient evidence to show he is not irreparably corrupt and is entitled to resentencing to two concurrent life sentences with the possibility of parole.[1]

**FACTS:**[2]

Defendant committed the first degree murders of his stepmother and her son on July 4, 1983, with the help of an accomplice, William Kinkade. Defendant was born on October 13, 1965, making him seventeen years, eight months, and twenty-one days old at the time of the murders.

Defendant's parents separated in 1977 when he was around twelve years old and his sister Robin was fourteen. Custody was granted to Defendant's father, George Hauser.[3] Defendant testified he went to live with his mother, Frances

---

[1] We note that our decision should not be interpreted as minimizing the seriousness of the horrendous crimes committed by Defendant; rather, our decision merely reflects the distinction that the current law now recognizes a difference between juveniles and adults who commit the crime of murder.

[2] The facts are taken from a composite of statements and discovery materials from the Beauregard Parish suit record in CR-1983-548 and of testimony elicited at the resentencing hearing. We believe a lengthy review of the facts is necessary because of the influence Defendant contends his background had on the crimes he committed.

[3] Because a number of people mentioned in this opinion bear the last name of "Hauser," we refer to them by their first names.

Hauser, to get away from his father. The next year, Defendant's parents agreed to transfer his custody to Frances. George testified he saw no future for Defendant in his home.

As an agricultural worker, George worked "from daylight to dark and sometimes more." Frances was the children's primary caretaker before the separation. When the children were little, George read books to them. As they got older, they would watch television together. The children grew up "just like any typical farm kids[,]" sometimes going fishing and performing "a few minor chores[.]" Although George was "not a lovey-dovey man," he "had appreciation for kids[,]" and most children liked him. The children played and visited with their cousins who lived nearby and participated in "school parties, Four-H Club activities." Defendant "was just a normal kid" who spent his time with George or Frances, his cousins or "some other kids in the neighborhood." Every two years the family visited Frances's family in Maryland; in the other years, the family vacationed at various places around the country.

The Hausers' divorce became final on January 4, 1979. In August of 1979, the Hausers agreed to transfer custody of Defendant's sister Robin to Frances. Defendant said Robin asked to live with Frances because George did not want her anymore. He said George put all of Robin's things "in garbage bags and put them out on the attorney's parking lot." Defendant and Frances rented a trailer and brought Robin and her things back to Kerrville, Texas.

George described Defendant as "the average kid" in relation to his performance in school. George did not whip the children, but he disciplined them with lectures. He did not consider Defendant to be a troublesome child. He thought Defendant wanted to live with Frances after the divorce because she babied him. George did not think the children ever feared him.

2

George had limited contact with his children once they moved to Texas with their mother. They saw each other only when George would "go get them," and he "didn't have funds to run to Texas." Still, he testified he saw them about every two weeks. However, Defendant testified George never called or wrote to the children after they went to live with their mother. Defendant disagreed with George's testimony that he saw them every other week and took them out to eat. He said George never initiated any contact with them. When asked whether Defendant and Joan had a loving relationship after he and Joan were married, George replied, "If you was [sic] a little kid and a strange woman moved in, would you have a loving relationship? You may have a respect, but you wouldn't have a loving relationship."

Defendant dropped out of school in the ninth grade, but he obtained his GED and wanted to further his education. He thought about going to Sowela Technical Community College to learn welding. When he told his father, George said Sowela cost $25 per month, so he would give him $25 a month but no more. Defendant looked at other options, but they were too expensive, so he enlisted in the Navy at age seventeen with his mother's consent. He "felt like that was the only way out to have a better life."

According to Defendant's testimony at the resentencing hearing, after he enlisted, he was beaten and sexually assaulted in boot camp. Mr. Kinkade was Frances's next-door neighbor, and he had also been in the Navy. Frances told Mr. Kinkade about what happened to Defendant, and he and Mr. Kinkade became good friends.

Defendant told no one in a position of authority about the assault, but he called Frances a few days later "and tried to tell her some of what happened." Defendant denied the incident happened when questioned by Navy investigators.

3

Their report of the attack indicates Defendant had a lump on his head and two fractured ribs when the investigators spoke to him. Defendant was discharged for medical reasons regarding his eyesight, and he returned to Kerrville.

Defendant testified Frances spoke to George about the assault and insisted that Defendant himself tell George what happened. Finally, Defendant called his father. After about thirty seconds of conversation, George told Defendant he was not his responsibility anymore, and the conversation ended.

George testified he never knew anything about Defendant being abused in the Navy. In fact, he believed Defendant "never was active or inducted or whatever. He was just wanting to." However, when asked about Defendant joining the Navy, George also testified Defendant had called one night and said whatever was going on "didn't suit him." George explained, "And he was wanting me to do something, but how could I do anything from here and this is up around the Great Lakes somewhere? And I told him, son, that's just part of it; you've got to learn to live, to take directions from somebody else."

Defendant "wanted to do anything to strike back" at George. He felt George "was responsible for what happened to [him] in the Navy[.]" Defendant said, "I felt like everything bad in my life at that time was caused by him." He believed "if he would have been a father to me, at least sometime in my life when I really needed it, I wouldn't have been hurting like I was then." Defendant no longer felt that way, but he testified, "No 17-year-old boy that something like that happen to him is going to be able to think clearly and rationally."

Defendant felt George had hurt his mother and his sister. Also, he felt if George "would have helped [him] get some kind of a more decent life, [he] wouldn't have enlisted in the Navy, [and the assault] wouldn't have happened." He wanted to get back at his father. Defendant "didn't have much of a

relationship" with his stepmother Joan, and he had no ongoing relationship with his stepbrother John. George considered himself to have "somewhat of a loving relationship" with John.

Mr. Kinkade gave a statement on the day of the murders in which he said Defendant had been upset about three weeks before when he had asked his father for money from a trust or other type of fund. George would not give him the money. Mr. Kinkade later agreed to go to Louisiana with Defendant to pick up some of his things. In Kerrville, they planned their trip to Beauregard Parish as a robbery. Defendant asked Mr. Kinkade to accompany him to take things his father had that belonged to him. He specifically mentioned education money that Defendant thought George had. They purchased surgical gloves so they would not leave fingerprints. Prior to the trip, Defendant paid for guns that Mr. Kinkade purchased in his name because Defendant was underage.

The pair left Kerrville on a Sunday evening in Frances's pickup truck and arrived in Beauregard Parish around 3:00 a.m. Frances was out of town to attend a relative's funeral. They parked their vehicle in the woods and left the truck with Defendant and Mr. Kinkade carrying flashlights they had purchased in Kerrville. Defendant carried a .223 caliber "mini-14" semi-automatic rifle, and Mr. Kinkade carried a .357 revolver. They waited in a shed near the house until daylight. Defendant took the mini-14 and led Mr. Kinkade under a fence and through a barn until they got close to the house. They saw a man leave the house, and Defendant went inside. While Mr. Kinkade waited outside for Defendant, he heard gunfire and a woman's scream from inside. He fled the scene to a nearby house and reported a shooting to the Beauregard Parish Sheriff's Department.

Defendant testified he did not see Joan's car at the house, and he thought no one was home. He wanted to retrieve a rock collection George would not let him

5

have and a small coin collection. However, Defendant said the main reason was "to let him know that – you know, that I hurt and that I felt like he hurt me a lot when I was a little kid." Defendant opened a door on the side of the house, still armed with the mini-14, and saw Joan there. He said he "just was overcome with emotion," and he went in the house and shot her. He then walked down the hall to his former bedroom and saw John in his bed. Defendant felt that was still his bedroom, and he was upset to see John there. He shot John in the face and the right arm. John's body was found in his bed with the covers pulled up over it. No blood was found on the outer covers, suggesting Defendant covered John after he shot him.

A cellmate of Defendant gave a statement saying Defendant told him about shooting Joan and John and robbing the house. Defendant told the cellmate he then found a pitcher of Kool-Aid in the refrigerator and drank it. Defendant admitted to his cellmate that he originally said Mr. Kinkade had murdered the victims.

Another cellmate gave a statement saying Defendant told him he wanted to "get back at his step mother and step brother for what they had done to him when he was little." Defendant described the shootings to him and told him how he found some money and took it, drank some Kool-Aid, took the car, and left. The cellmate said Defendant laughed the entire time he told his story.[4]

After the murders, Defendant looked around the house for his collections, focused on wanting his things. Texas authorities arrested Defendant in Kerrville later in the day in the vehicle he and Mr. Kinkade had taken to DeRidder. They seized gold and silver coins, a mini-14 semi-automatic rifle, ammunition, a pair of surgical gloves, and other items. When George later went through the house, he

_____

[4] Defense counsel stipulated to the admission of these statements.

6

said gold and silver coins, paper money, savings bonds in his name, and a savings passbook were missing.

Joan's autopsy report indicated she sustained two gunshot wounds, either of which could have been fatal. One wound was to the right cheek below the right eye, and the second wound was to the right posterior chest. John's autopsy report indicated he also sustained two gunshot wounds. The wound to his head, just below the right eye, caused his death. A second wound was to his right forearm.

Mr. Kinkade was also charged with two counts of first degree murder and one count of aggravated burglary for his part in these events. *State v. Kinkade*, 470 So.2d 442 (La.App. 3 Cir. 1985). He pled guilty to attempted aggravated burglary in exchange for dismissal of those charges. This court affirmed his sentence of fifteen years at hard labor, enhanced with an additional mandatory two-year term to be served consecutively and without benefit of parole, probation, suspension of sentence, or credit for good time pursuant to La.R.S. 14:95.2 because his crime involved the use of a firearm.

George believed the State should pursue the death penalty for Defendant's crimes. However, he was advised that a jury would probably not do that, and he believed Defendant would spend his life in prison without parole. George's step-children (Joan's surviving children) agreed to life sentences without parole. George believed Defendant would "never be a productive citizen." He had not communicated with Defendant since the murders because he had no "interest in associating with somebody with that frame of mind." Although Defendant wrote to George a few times during his first year or two at Angola, he "never asked for forgiveness or apologized or anything." George preferred that Defendant "stays locked up." If Defendant were released, George would "like for the Court to have him stay out of Beauregard Parish . . . ."

7

Of Joan's four children, two were adults, and one was in college. Only John lived in George's home. John told his father he would rather live with George in the country than with his father in town. George considered that "somewhat of a loving relationship."

George testified he was a Christian who believed in the hereafter. At first, he said he believed people could change. However, George stood by his belief that, even in spite of evidence, Defendant has not changed since the murders. He felt Defendant had the opportunity for a relationship as he was growing up in George's home, but instead, he chose "to go out and kill two people."

Dr. Raymond Leidig, a veterinarian who was Joan's first husband, testified the District Attorney's office had advised him and his children "on what to accept" as Defendant's plea. Dr. Leidig understood Defendant "had pleaded guilty and would take life imprisonment without parole." He believed Defendant "should stay, serve his sentence" for the rest of his life. When asked if he believed people could be rehabilitated, Dr. Leidig responded, "I believe people can be saved and forgiven by God."

About ten years after the murders, Dr. Leidig received a letter from Defendant in which Defendant asked for Dr. Leidig's forgiveness. Dr. Leidig told Defendant he had forgiven him, "but the two people on this earth that needed to forgive him were in the grave and that the only forgiveness he could seek further than that would be forgiveness from the Lord God and I wished that he would." Defendant wrote Dr. Leidig again to say "he had found God in a prison church service[,]" and he thanked Dr. Leidig for responding to his letter.

Dr. Leidig said Defendant wrote him again about a month later. He "just about called every name that any person could call anybody; and some of them wasn't [sic] too nice. And low-rated me for not writing him back after the second

8

letter." Dr. Leidig described Defendant's words as "[p]rofanity and anything else you want to think of." Dr. Leidig told the trial court, "when the Supreme Court made this ruling, they were unable to make a ruling that would raise my son and his mother from the grave. Since they've got to stay there, my personal feeling is that the man that put them there should have to stay where he is." When asked about his beliefs of convicted felons, he explained, if you serve your time that is set, put upon you by the courts, you have the right to be released." Dr. Leidig could not say whether Defendant had been changed with rehabilitation, but he would be glad if that were true.

Donna Kay Leidig Kelly, John's sister, testified she had been in favor of the death penalty for Defendant, but "[a]s long as he was going to stay" in prison, she "was good with that. Because [she] would not have to deal with this again, ever." Ms. Kelly opposed Defendant having parole eligibility. She worked in the medical field, and she had "seen what the outcome of some supposedly rehabilitated people have done."

Ms. Kelly testified she was never aware of any conflict that had arisen between Joan and Defendant or John and Defendant. She knew of nothing that may have provoked Defendant. Ms. Kelly heard the testimony insinuating Defendant lacked attention from and had a tough life living with George. She noted her mother and brother contributed nothing to that, but they were the ones he killed. She said John enjoyed his life on the farm, liked being outdoors, and never complained about George, who she said she had never seen get mad. Her mother likewise never complained about George being abusive or mean. Ms. Kelly described George as "a wonderful man" who was very good to her mother and her brother. She has had no contact with or from Defendant since the murders.

David Leidig, Joan's son and John's brother, testified he had no bad feelings toward Defendant. However, he felt Defendant "should stay in prison to serve his sentence which was agreed to at that time." He did not think Defendant should have parole eligibility. Neither Joan nor John ever told Mr. Leidig of any conflict with Defendant or of anything that might have provoked him. Mr. Leidig did not recall ever meeting Defendant, and he had never had any contact with him. He considered Defendant's acts to be those "of a cold-blooded killer." He thought those acts "elevate[] this crime to a different level[.]" He also felt Defendant "chose life without parole, not 35 years then parole."

**PROCEDURAL HISTORY:**

On March 19, 2013, Defendant filed a pro se motion to correct an illegal and invalid sentence based on *Miller*. The trial court denied the motion without a hearing on March 22, 2013, finding Defendant was an adult over the age of eighteen and not a juvenile, as his motion alleged.[5] This court denied Defendant's writ application on the grounds that *Miller*, 567 U.S. 460, did not apply retroactively. *State v. Hauser*, 13-391 (La.App. 3 Cir. 8/5/13) (unpublished opinion). The Louisiana Supreme Court denied his writ application. *State ex rel. Hauser v. State*, 13-2028 (La. 7/31/14), 146 So.3d 202.

Defendant filed a motion to have counsel appointed to represent him on August 7, 2013. The trial court denied that motion because Defendant was represented by counsel at the time he was sentenced and because *Miller* did not apply retroactively.

On September 4, 2014, Defendant filed a petition for writ of *habeas corpus* in the United States District Court for the Western District of Louisiana. While

---

[5] To avoid confusion, we refer to the court that accepted Defendant's plea and imposed his sentences as "the sentencing court" and to the court that presided over post-conviction proceedings as "the trial court."

Defendant's *habeas* writ was pending, the State filed a motion to implement the new rule of law set out in *Miller* and *Montgomery* on April 13, 2016. The motion explained that legislation pending at the time would incorporate those decisions into Louisiana law; once that legislation was enacted, Defendant would be entitled to the hearing he requested in his motion to correct his illegal and invalid sentence. Thus, the State asked the trial court to reconsider Defendant's motion in light of *Miller* and *Montgomery*. The trial court issued an order on April 13, 2016, for a hearing to be set within sixty days of the effective date of the anticipated new legislation implementing *Miller* and *Montgomery*.

The State filed another motion to reconsider Defendant's sentence on June 23, 2016. That motion sought a sentencing hearing pursuant to La.Code Crim.P. art. 878.1 in effect at the time even though the legislature had failed to enact the expected legislation. The State noted Defendant would be entitled to a hearing on his parole eligibility according to *Miller* and *Montgomery* even without new legislation. In response, the trial court appointed counsel for Defendant and scheduled a status conference to discuss pre-hearing issues.

On July 13, 2016, Defendant filed another motion to correct an illegal sentence and set a date for the *Miller* hearing. He also asked the trial court to appoint counsel and to provide funding for experts for his defense team. Specifically, Defendant's motion sought a defense team of two lawyers with specialized experience, a fact investigator, and a mitigation investigator. The trial court denied the motion as moot and "[a]lready addressed."

Defendant made an oral motion to recuse both judges of the Thirty-Sixth Judicial District Court on July 26, 2016, followed by a written motion filed on September 9, 2016. Judge Vernon B. Clark of the Thirtieth Judicial District Court was appointed to hear the motion. On November 17, 2016, Judge Clark rendered a

11

written judgment granting the motion to recuse as to Judge Martha Ann O'Neal but finding no factual basis to recuse Judge C. Kerry Anderson. The judgment designated Judge Anderson as the presiding judge for all future proceedings in the matter.

After numerous filings (indicated on the federal court's docket sheet), on September 2, 2016, the federal court granted Defendant's petition for *habeas corpus* and remanded his case to the trial court for resentencing. Defendant filed a motion for a "reliable sentencing hearing" consistent with *Miller* and for a funding source for mitigation specialists on April 28, 2017. The trial court responded by setting a pre-trial conference to discuss scheduling and pre-trial issues and to set a scheduling order.

On September 19, 2017, the State filed its notice of intent to seek sentences of life without the possibility of parole ("LWOP") pursuant to La.Code Crim.P. art. 878.1 and 2017 La. Acts No. 277. On September 27, 2017, the State filed an opposition to Defendant's motion for a reliable sentencing hearing. It also filed procedural objections to Defendant's claim of a right to resentencing pursuant to *Miller* and *Montgomery* on December 12, 2017.

The trial court issued an order on January 24, 2018, setting a *Miller/Montgomery* hearing. On January 31, 2018, the trial court issued another order denying Defendant's request to provide funds for a mitigation specialist. The order also denied Defendant's request to require the State to prove aggravating factors at the *Miller/Montgomery* hearing. The trial court filed written reasons for its rulings.

On March 23, 2018, Defendant filed a motion to preclude a life sentence without parole because of the State's failure to provide funding for the resentencing hearing. Defendant also filed a motion for funding for a psychologist

12

or psychiatrist and other expert witnesses in anticipation of the resentencing hearing on April 25, 2018.[6]  The hearing of that motion and for resentencing began on April 26, 2018.  The trial court issued an order on May 30, 2018, which stated:

> [T]he Court hereby DENIED the motion for Funding to be provided by the Criminal Court Fund and DENIED that defendant proved the necessity of expert testimony but hereby ORDERS the Office of the Public Defender for the 36th Judicial District or the Louisiana Public Defender Board to pay the appointed or designated psychiatric/psychological examination or any other expert deemed desirable by defense at a cap of $3500 upon receipt of an itemized bill for services rendered.

The resentencing hearing reconvened on July 6, 2018, to accept exhibits from both parties, hear testimony from witnesses, and establish a post-hearing briefing schedule.  Prior to the close of the hearing, the trial court ascertained that Defendant had been given the opportunity to present all the evidence he wanted.  Defendant filed his memorandum in support of his resentencing on August 14, 2018, and the State filed its memorandum on August 30, 2018.

On December 20, 2018, the trial court issued its ruling and ordered Defendant to "continue to serve his existing sentences of life imprisonment without parole eligibility on each of the two counts of First Degree Murder."  Defendant now appeals that ruling.

On appeal, Defendant raises the following assignments of error:

1.      The Trial Court Violated Clearly Established Law in Ruling that *Miller v. Alabama* Does Not Apply to this Case.

2.      The Trial Court Failed to Vacate the Previously Imposed Unconstitutional Sentence.

3.      Because the Trial Court Ruled that *Miller* did not Apply, it Failed to Undertake the Analysis Required By the Eighth Amendment.

4.      The Trial Court Erred in Concluding that Aaron Hauser's Crime was not the Result of Transient Immaturity.

---

[6] This motion was filed under seal.

5.   The Trial Court Failed to Conduct an Analysis as to whether Aaron Hauser is Irreparably Corrupt, resulting in an Unconstitutional Sentence.

6.   The Sentencing Judge's Improper Focus on the Nature of the Crime Further Rendered Him Unable to Undertake the Analysis Required by the Eighth Amendment.

7.   The State Failed to Meet its Burden in Establishing that Aaron Hauser is the "Worst Offender" with the "Worst Case."

8.   The Trial Court Erred in Failing to Apply a Presumption Against Sentencing a Juvenile to Life Without the Possibility of Parole.

9.   The State Failed to Rebut the Presumption that Aaron Hauser Should be Eligible for Parole When it Failed to Prove that he is the Rare Juvenile Who is Irreparably Corrupt.

10.   No Reasonable Sentencer could Conclude that Aaron Hauser has not Demonstrated Maturity and Rehabilitation.

11.   The Trial Court Erred when it Denied Aaron Hauser a Critical Member of his Defense Team — a Mitigation Investigator.

12.   Aaron Hauser's Sixth Amendment Rights were Violated when he was Sentenced by a Judge instead of a Jury.

13.   The Trial Court Erred when it Failed to Limit the Scope of Victim Impact Evidence and Testimony[.]

14.   Aaron Hauser was denied his Sixth Amendment right to Effective Assistance of Counsel at Sentencing[.]

15.   Aaron Hauser was Denied Effective Assistance of Counsel because his Attorneys Were Working under a Direct Conflict of Interest.

16.   Aaron Hauser's Counsel Failed to Demand on his Behalf "All Resources Necessary to Provide High Quality Legal Representation" as Mandated by the LPDB Performance Standards.

17.   Aaron Hauser's Counsel Failed to Assemble the Defense Team Mandated by the LPDB Performance Standards.

18.   Aaron Hauser's Counsel Failed to Perform the Mitigation Investigation required by *Miller v. Alabama*, *State v. Montgomery*, La. C. Cr. P. art. 878.15 and the LPDB Performance Standards.

19.   The Absence of Mitigating Evidence at the Sentencing Hearing was not the Result of Defense Counsel's "Reasonable Strategic

Decisions" Because she Failed to Perform the Investigation Necessary to Make those Decisions.

20.     Counsel's Deficient Performance Prejudiced the Defense at Aaron Hauser's *Miller* Sentencing Hearing and Resulted in the Trial Court Erroneously Sentencing Aaron to Die in Prison.

**ERRORS PATENT:**

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find there are no errors patent.

**DISCUSSION:**

Before we address Defendant's specific claims, we begin with a review of the applicable Louisiana statutes and controlling jurisprudence regarding juvenile sentencing. Louisiana Code of Criminal Procedure Article 878.1 states, in pertinent part:

> B. (1) If an offender was indicted prior to August 1, 2017, for the crime of first degree murder (R.S. 14:30) or second degree murder (R.S. 14:30.1) where the offender was under the age of eighteen years at the time of the commission of the offense and a hearing was not held pursuant to this Article prior to August 1, 2017, to determine whether the offender's sentence should be imposed with or without parole eligibility, the district attorney may file a notice of intent to seek a sentence of life imprisonment without the possibility of parole within ninety days of August 1, 2017. If the district attorney timely files the notice of intent, a hearing shall be conducted to determine whether the sentence shall be imposed with or without parole eligibility. If the court determines that the sentence shall be imposed with parole eligibility, the offender shall be eligible for parole pursuant to R.S. 15:574.4(G). If the district attorney fails to timely file the notice of intent, the offender shall be eligible for parole pursuant to R.S. 15:574.4(E) without the need of a judicial determination pursuant to the provisions of this Article. If the court determines that the sentence shall be imposed without parole eligibility, the offender shall not be eligible for parole.
>
>      . . . .
>
> C. At the hearing, the prosecution and defense shall be allowed to introduce any aggravating and mitigating evidence that is relevant to the charged offense or the character of the offender, including but not limited to the facts and circumstances of the crime, the criminal

history of the offender, the offender's level of family support, social history, and such other factors as the court may deem relevant. The admissibility of expert witness testimony in these matters shall be governed by Chapter 7 of the Code of Evidence.

D. The sole purpose of the hearing is to determine whether the sentence shall be imposed with or without parole eligibility. The court shall state for the record the considerations taken into account and the factual basis for its determination. Sentences imposed without parole eligibility and determinations that an offender is not entitled to parole eligibility should normally be reserved for the worst offenders and the worst cases.

Louisiana Revised Statutes 15:574.4(G) states, in pertinent part:

(1) Notwithstanding any provision of law to the contrary, any person serving a sentence of life imprisonment for a conviction of first degree murder (R.S. 14:30) or second degree murder (R.S. 14:30.1) who was under the age of eighteen years at the time of the commission of the offense and whose indictment for the offense was prior to August 1, 2017, shall be eligible for parole consideration pursuant to the provisions of this Subsection if a judicial determination has been made that the person is entitled to parole eligibility pursuant to Code of Criminal Procedure Article 878.1(B) and all of the following conditions have been met:

(a) The offender has served twenty-five years of the sentence imposed.

(b) The offender has not committed any major disciplinary offenses in the twelve consecutive months prior to the parole hearing date. A major disciplinary offense is an offense identified as a Schedule B offense by the Department of Public Safety and Corrections in the Disciplinary Rules and Procedures for Adult Offenders.

(c) The offender has completed the mandatory minimum of one hundred hours of pre-release programming in accordance with R.S. 15:827.1.

(d) The offender has completed substance abuse treatment as applicable.

(e) The offender has obtained a GED certification, unless the offender has previously obtained a high school diploma or is deemed by a certified educator as being incapable of obtaining a GED certification due to a learning disability. If the offender is deemed incapable of obtaining a GED certification, the offender shall complete at least one of the following:

(i) A literacy program.

16

(ii)     An adult basic education program.

(iii)     A job skills training program.

(f) The offender has obtained a low-risk level designation determined by a validated risk assessment instrument approved by the secretary of the Department of Public Safety and Corrections.

(g) The offender has completed a reentry program to be determined by the Department of Public Safety and Corrections.

(2) For each offender eligible for parole consideration pursuant to the provisions of this Subsection, the board shall meet in a three-member panel, and each member of the panel shall be provided with and shall consider a written evaluation of the offender by a person who has expertise in adolescent brain development and behavior and any other relevant evidence pertaining to the offender.

(3) The panel shall render specific findings of fact in support of its decision.

In *Miller*, the Supreme Court addressed the life sentences without the possibility of parole of two juvenile defendants, one from Alabama and the other from Arkansas. The Court held "the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders." *Miller*, 567 U.S. at 479. The Court did not "foreclose a sentencer's ability to make that judgment in homicide cases," but it required courts "to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Id.*

*Miller* "does not categorically bar a penalty for a class of offenders or type of crime . . . ." *Id.* at 483. It does require a sentencing court to "follow a certain process—considering an offender's youth and attendant characteristics—before imposing a particular penalty." *Id.* That court "must have the opportunity to consider mitigating circumstances before imposing the harshest possible penalty for juveniles." *Id.* at 489.

17

*Montgomery* likewise prescribed a hearing to consider "'youth and its attendant characteristics'" as sentencing factors. *Montgomery*, 136 S.Ct. at 735. The Court found parole eligibility ensures "juveniles whose crimes reflected only transient immaturity—and who have since matured—will not be forced to serve a disproportionate sentence in violation of the Eighth Amendment." *Id.* at 736. "The opportunity for release will be afforded to those who demonstrate the truth of *Miller*'s central intuition—that children who commit even heinous crimes are capable of change." *Id.* Thus, prisoners sentenced to LWOP as juveniles "must be given the opportunity to show their crime did not reflect irreparable corruption; and, if it did not, their hope for some years of life outside prison walls must be restored." *Id.* at 736-37.

**ASSIGNMENT OF ERROR NO. 1:**

Defendant argues the trial court violated clearly established law in ruling that he was not entitled to a hearing pursuant to *Miller*. The trial court issued a lengthy and detailed ruling on December 20, 2018, in which it agreed with the State that *Miller* did not apply to this case because Defendant's sentence was imposed pursuant to a plea agreement. However, even though it found *Miller* did not apply, the trial court proceeded with a hearing pursuant to La.Code Crim.P. art. 878.1 and La.R.S. 15:574.4. Defendant contends the trial court's ruling violates the federal court's remand for resentencing under *Miller*.

In *State ex rel. Jenkins v. State*, 17-302, p. 1 (La. 8/31/18), 252 So.3d 476, 476 (per curiam), our supreme court, citing *Montgomery*, 136 S.Ct. at 736, held "[a] State may remedy a *Miller* violation by permitting juvenile homicide offenders to be considered for parole, rather than by resentencing them." The court determined a *Miller* hearing was unnecessary because La.R.S. 15:574.4(E)

remedies a *Miller* violation by providing parole eligibility. Thus, the defendant was entitled to parole eligibility without a *Miller* hearing.

Louisiana Revised Statutes 15:574.4(G) now provides parole eligibility when statutory requirements are met for juveniles, such as Defendant, who were convicted of first degree murder and indicted prior to August 1, 2017. We find the supreme court's ruling in *Jenkins*, 252 So.3d 476, recognizes that La.R.S. 15:574.4(G) satisfies the *Miller* requirements. Thus, Defendant received the hearing *Miller* requires, even though the trial judge said the case itself did not apply.

The defendant in *State v. Doise*, 15-713 (La.App. 3 Cir. 2/24/16), 185 So.3d 335, *writ denied,* 16-546 (La. 3/13/17), 216 So.3d 808, was also a juvenile at the time he committed second degree murder. He also pled guilty. The trial court sentenced him to life imprisonment with parole eligibility after serving thirty-five years.

The *Doise* defendant argued La.Code Crim.P. art. 878.1 and La.R.S. 15:574.4(E) did not satisfy *Miller* and were unconstitutional. This court noted the article and the statute were enacted in response to *Miller* and found "the mere possibility of being released on parole is more than sufficient to satisfy the chance of parole eligibility after a hearing established in *Miller* for juvenile homicide offenders." *Doise*, 185 So.3d at 342. Thus, "the mere access to the Board of Parole's consideration satisfies the mandates of *Miller*." *Id*. We note La.R.S. 15:574.4(G) provides the same remedy to defendants indicted prior to August 1, 2017, as Subsection (E) was determined to grant in *Doise* at the time, before Subsection (G) was enacted.

Further, in *Doise*, this court cited *Graham v. Florida*, 560 U.S. 48, 130 S.Ct. 2011 (2010), in which the Supreme Court held "a juvenile who commits a non-

homicide offense punishable by life imprisonment *must* be *eligible* for parole."

*Doise*, 185 So.3d at 342. However, relying on *State v. Shaffer*, 11-1756 (La. 11/23/11), 77 So.3d 939 (per curiam), this court noted, "the juvenile may not be *released* on parole unless the Board of Parole decides to release him. . . . Thus, in reality, a juvenile who commits a non-homicide offense punishable by life in Louisiana is only promised the possibility of being released on parole."[7] *Doise*, 185 So.3d at 342. This court stated, "It stands to reason that a juvenile who commits a *homicide* offense punishable by life imprisonment should be granted no greater relief" than one who commits a non-homicide offense. *Id.* Based on these principles, this court concluded the defendant failed to prove the legislative provisions implemented in response to *Miller* were unconstitutional.

Applying this court's reasoning in *Doise*, 185 So.3d 335, we find the provisions of La.Code Crim.P. art. 878.1 and La.R.S. 15:574.4(G) provide the same protections as *Miller*. Further, La.Code Crim.P. art. 878.1(D) and *Miller* both recognize the sole purpose of the hearing is to determine parole eligibility. Thus, the trial court correctly believed it was "only tasked with determining whether the Defendant should be granted an *opportunity for parole consideration*."

In the *Montgomery* remand from the Supreme Court, our supreme court explained:

> During the 2016 legislative session, legislation was proposed to address those cases in which persons that committed murder as juveniles and were sentenced to life imprisonment without parole eligibility before *Miller* was decided, who the Supreme Court determined in *Montgomery* must be resentenced in accordance with the principles enunciated in *Miller*. However, the Legislature ultimately failed to take further action in the last few moments of the legislative session regarding sentences of life without parole for juvenile homicide offenders. *See* HB 264 of the 2016 Regular Session. Therefore, in the absence of further legislative action, the

---

[7] *Shaffer*, 77 So.3d 939, has now been superseded in part by the amendments and enactments to La.R.S. 15:574.4.

20

previously enacted provisions should be used for the resentencing hearings that must now be conducted on remand from the United States Supreme Court to determine whether Henry Montgomery, and other prisoners like him, will be granted or denied parole eligibility.

*State v. Montgomery*, 13-1163, p. 3 (La. 6/28/16), 194 So.3d 606, 608 (*Montgomery II*). The "previously enacted provisions" to which the supreme court referred are La.Code Crim.P. art. 878.1 and La.R.S. 15:574.4(E). *Montgomery II*, 194 So.3d at 607. Additionally, "the District Court must also be mindful of the Supreme Court's directive in *Miller,* 132 S.Ct. at 2469, 'to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison.'" *Montgomery II*, 194 So.3d at 609. Accordingly, even though the trial court found *Miller* to be inapplicable, it still considered the *Miller* test by applying La.Code Crim.P. art. 878.1 and La.R.S. 15:574.4(G) and by addressing the *Miller* directives. Thus, even if the trial court erroneously found *Miller* did not apply, Defendant received the hearing *Miller* requires.

The trial court noted Defendant agreed to the sentences. The sentencing court necessarily had to consider the agreement before it accepted it. The trial court's ruling explained that once the sentencing court accepted the agreement, it had no choice about the sentences. Nevertheless, because Defendant had to decide to enter the plea, and the sentencing court had to decide whether to accept it, the trial court found the resulting sentences were not mandatory. The trial court believed the sentencing court "would have of necessity included consideration of the mitigating characteristics" of Defendant's youth.

We find that the sentencing court carefully ensured that Defendant understood all the rights he relinquished by making his plea. The court questioned Defendant about his education; his understanding of prior proceedings, the charges

21

in his case, his *Boykin* rights, the possible verdicts at trial, the possible sentences for those possible verdicts, the ramifications of his plea, and the voluntary and free will nature of his plea, and the facts of the case prior to accepting the plea. The trial court did not, however, question Defendant about the *Miller* factors, presumably because it had no discretion in imposing the statutorily-required sentences for the pled charges. Thus, we find that the plea colloquy did not, contrary to the trial court's ruling, consider any mitigating circumstances or satisfy the requirements of *Miller*. However, as discussed, the trial court applied the *Miller* factors and provided Defendant with a *Miller*-equivalent hearing at resentencing. Thus, we find this assignment of error lacks merit.

**ASSIGNMENT OF ERROR NO. 2:**

Defendant contends the trial court erroneously failed to vacate the previously imposed unconstitutional sentences. Instead, the trial court ordered Defendant to "continue to serve his existing sentences of life imprisonment without parole eligibility on each of the two counts of First Degree Murder."

The purpose of the federal court's remand was to resentence Defendant pursuant to *Miller/Montgomery*. The trial court's sole purpose was to determine whether Defendant's mandatory life sentences were to be served with or without parole eligibility as the court did in *Montgomery II*.

We find that the trial court did just that. Had the trial court determined Defendant was eligible for parole, it presumably would have vacated the sentences and resentenced him to life imprisonment with parole eligibility. However, because the trial court determined Defendant was not parole eligible, vacating his prior sentences and resentencing him to two new terms of life imprisonment without parole eligibility was unnecessary. As this court noted in *State v. Comeaux*, 17-682, p. 5 (La.App. 3 Cir. 2/15/18), 239 So.3d 920, 926, *writ denied,*

22

18-428 (La. 1/14/19), 261 So.3d 783 (emphasis in original), "[g]iving *Miller* retroactive effect, moreover, does not require States to relitigate sentences, let alone convictions, in every case where a juvenile offender received mandatory life without parole. **A State may remedy a *Miller* violation by permitting juvenile homicide offenders to be considered for parole, rather than by resentencing them.**" Accordingly, we find no merit to this assignment of error.

**ASSIGNMENTS OF ERROR NOS. 3, 4, 5, 6, 7, 8, AND 9:**

Defendant argues the trial court's failure to apply *Miller* led to its failure to undertake the analysis required by the Eighth Amendment. Thus, Defendant was deprived of his substantive sentencing rights created by *Miller* and applied by *Montgomery*. As discussed in Assignment of Error No. 1 above, we find that the trial court's analysis under La.Code Crim.P. art. 878.1 and La.R.S. 15:574.4(E) satisfies the *Miller* directive.

Defendant contends the trial court erred by failing to make the specific finding that his crime was not the result of transient immaturity. He also alleges the trial court failed to conduct an analysis to determine whether he is irreparably corrupt. Defendant also contends the trial court placed improper focus on the heinous nature of the crimes. These errors, Defendant argues, rendered the trial court unable to perform the proper analysis required by the Eighth Amendment and led to an unconstitutional sentence.

Defendant also contends the State failed to establish he is the "worst offender" with the "worst case." He believes the trial court erroneously failed to apply a presumption against sentencing a juvenile to life without the possibility of parole. He also argues the State failed to rebut a presumption that he should be eligible for parole and failed to prove he is the rare juvenile who is irreparably corrupt.

The *Montgomery* court explained consideration for parole eligibility ensures that "juveniles whose crimes reflected only transient immaturity—and who have since matured—will not be forced to serve a disproportionate sentence in violation of the Eighth Amendment." *Montgomery*, 136 S.Ct. at 736. *Montgomery* notes any pre-*Miller* juvenile convicted of homicide could receive a LWOP sentence. Post-*Miller*, however, "it will be the rare juvenile offender who can receive that same sentence." *Montgomery*, 136 S.Ct. at 734.

However, a juvenile who is a worst offender in the worst case is not entitled to the possibility of parole. Justice Crichton of our supreme court recognized the "unfortunate truth" that some inmates "demonstrate irretrievable depravity, . . . have set forth zero effort towards rehabilitation and redemption, and are simply not ready for a parole eligible adjudication." *Montgomery II*, 194 So.3d at 610 (Crichton, J., concurring). In contrast, other inmates "were the victims of their own once transient immaturity and regrettable impulsivity, long since passed[.]" *Id.* Those inmates "present the lowest risk designation based on their rehabilitative progress through the years." *Id.*

We find that neither *Miller/Montgomery* nor *Montgomery II* require a court considering parole eligibility to make factual findings of transient immaturity or irreparable corruption. Rather, those cases instruct a court to consider the circumstances of each particular case and determine whether those circumstances show a LWOP sentence is unconstitutionally disproportionate to the crimes committed as a juvenile. Thus, *Miller/Montgomery* do not necessarily presume a juvenile should be eligible for parole. Nevertheless, we find the evidence presented at the hearing, taken as a whole, shows Defendant may not be the "worst offender" with the "worst case" who is irreparably corrupt. Defendant has shown

24

significant effort toward rehabilitation and redemption, and Angola considers him to be of its lowest risk designation.

Robert Lowrey, Jr. testified at the hearing as a licensed professional counselor with his most recent work "in relationship counseling, juvenile work, custody evaluations, and such as that." He had experience working with the Department of Children and Family Services and the Office of Juvenile Justice. The bulk of his work was "with juveniles and with relationship therapy. Marriage." He had no involvement with *Miller/Montgomery* cases before this.

The trial court accepted Mr. Lowrey as an expert in the field of counseling, and Mr. Lowrey testified on Defendant's behalf. He explained the "rather interesting description" of the American Academy College of Pediatricians (AACP) regarding "the teenage brain under construction." The developing front lobe is "not fully connected with the part of the brain that involves emotional response; and . . . the frontal lobe is not fully developed until ages 23 to 25." Thus, "the adolescent is impeded in how to connect choices with emotions." The "thorough understanding of voluminous research in the field" is that the teenaged brain is not fully developed. Mr. Lowrey explained:

> The research overwhelmingly indicates that [seventeen-year-old juveniles] operate impulsively and in the emotional spectrum, rather than the intellectual spectrum because of the frontal lobe development or lack of development. The brain kind of matures at a point 23 to 25, and then we now call that an adult brain. Prior to that it is still exploding and developing and all of that. That has been indicated not only by counselors but by brain imaging and all kind of nuclear medicine work.

The ability to "connect a behavior with a consequence" was something Mr. Lowrey testified "adolescents are extremely lacking in ability to do." Such adolescents "operate more out of an emotional level rather than a reasoned level because of the developing position of the frontal lobe, which is the judgment

25

center. Or it has even been called in research the chief executive officer of the brain."

Additionally, "[a]dolescents are most often highly influenced by peer groups." Thus, "they find it difficult to choose their own opinion over the peer group's opinion. They are heavily influenced by the peer group during the time of adolescence." Mr. Lowrey felt Defendant "would normally be influenced by an older peer." However, Mr. Lowrey agreed a seventeen-year-old would have an understanding of the permanency of death and would know that shooting someone in the head would likely cause death.

According to Mr. Lowrey, "[t]rauma and authoritarian parenting make it very difficult for juveniles." He described authoritarian parenting as "the military style. Do what I say when I say do it. Don't ask any questions." The "other side" is permissive, where a child can do what he wants; the "middle ground is the better ground, and that is called authoritative." Mr. Lowrey would not "seek to judge [George] Hauser's mental workings" by stating an opinion about which style George used, but he testified he "was distressed" by George's comment that he was not a "lovey-dovey" person. An evaluation of George's parenting would require "extensive discussions" with him. Mr. Lowrey explained a parenting style could influence how a juvenile learns "to cope with life." He admitted he knew no details of this case other than Defendant murdered his stepmother and her son. He understood the purpose of the hearing was "to see what has happened in the last 35 years."

Mr. Lowrey met Defendant at Angola approximately eight years before the hearing, and they have corresponded periodically since that time. Defendant's cousin told Mr. Lowrey "no one had visited him from the family in 11 years." Mr. Lowrey helped her facilitate a visit.

26

The correspondence between Defendant and Mr. Lowrey was "just a personal connection" and not based on a professional relationship; Mr. Lowrey's experience was that incarcerated people "need a friend." Mr. Lowrey believed people can change. His initial contact with Defendant made him think Defendant "had a focus on making a life for himself within the prison for whatever length he was going to be there." Mr. Lowrey felt "he needed some encouragement."

Defendant and Mr. Lowrey corresponded "[f]our times a year, until recently[,]" when their correspondence increased. Mr. Lowrey, based on the correspondence, "came to believe that [Defendant] had learned a lesson or was learning a lesson and was capable of changing. And [his] impression has been that [Defendant] is not a danger to anyone else at this point." Defendant never expressed himself in their correspondence as angry, frustrated, or out of control. Mr. Lowrey clarified he was "not expressing a professional opinion[.]"

Mr. Lowrey testified Defendant had the "highly coveted" position of working at Angola's K-9 unit, a position that was "hard to achieve." Nevertheless, he was "not aware of anything that has been done with [Defendant] since his incarceration at Angola." He had seen Defendant only one time for "[p]robably 40 minutes." He has done no professional evaluation.

Defendant's success at Angola was within a highly structured environment. Mr. Lowrey believed "[i]f someone has been incarcerated for 35 years, they have learned how to cope with a variety of circumstances in a non-confrontive way; or, otherwise, they would be injured or dead." Mr. Lowrey's testimony about Defendant reflected simply what he felt personally from their relationship. As Mr. Lowrey stated, his testimony was not the result of a professional endeavor, examination, or evaluation.

Terry Lane testified as a clinical social worker who "currently run[s] juvenile and adult sex offender treatment for adjudicated and/or convicted, with a few private referrals." He received training in victim intervention and was certified as a trauma interventionist. The trial court accepted Mr. Lane "as an expert in the field of sex abuse victims."

Mr. Lane believed recent research showed brain development is not complete until around age twenty-seven to thirty. The prefrontal cortex of the brain is the area of most concern when working with and treating juveniles; it deals with motor control, concentrating, planning, and problem solving.

Mr. Lane testified when Defendant was first at the naval training center in 1983, "he was having some stressful events at the time already." Defendant initially reported the physical and sexual assault on April 29, 1983. When Defendant returned to his hometown in Texas, he reported the assault to his recruiter. Mr. Lane testified his understanding of the assault was that "unidentified males, possibly two white and one Hispanic . . . carried a pipe with some kind of padding or towels wrapped, maybe, on the end of it, and administered a beating to [Defendant] about the head and body, tied him to a bed, and sodomized him[.]" Mr. Lane's experience was that a victim such as Defendant typically felt ashamed and embarrassed about such an event. He stated:

> Younger children actually have some excited response that they feel very negatively about; and so there's many, many dynamics going on in a brain that the prefrontal cortex has clearly not reached a developmental stage that is equal to the adults that are in the situation and is much more emotionally responsive than logical.

Mr. Lane felt that type of trauma "allows a distortion" which he described as "a change in perspective. And those juveniles have their cognitive processing, their thinking, modified by the introduction of information that they're not old enough

or mature enough to handle." Such juveniles often do not report the event for years.

Mr. Lane felt Defendant's untreated problems resulting from the assault were important to know because they create "immense self-esteem issues." Victims failed to understand what they did "to play into this role." Mr. Lane said, "It lowers their insulation against peer input in negative fashion, for sure; but it states more to a general I'm-not-worth-it attitude . . . ." Mr. Lane found it normal that Defendant had not told his father about the assault. If Defendant saw the attack "as somewhat his fault in some way . . . then he's less likely to go to the dominant disciplinarian in his life to disclose what he sees as a weakness." However, Mr. Lane had no "firsthand knowledge about the relationship" between Defendant and his father.

Mr. Lane did not feel the trauma Defendant experienced excused the murders. He only met Defendant ten minutes before his testimony. His purpose in testifying was to "talk about impacts and additional pressures and stressors that could have been applied at the time . . . ." Juveniles do not have the same resources or skills to resolve those stressors as adults have. Mr. Lane understood Defendant's case was being reviewed for the appropriateness of the sentence, not for guilt or innocence.

Thomas Roller knew Defendant from Angola. Mr. Roller had "lived at the dog pen" with Defendant for his last eight years in prison. He was incarcerated for the second degree murders of his father and stepmother on February 26, 1988, six days before his eighteenth birthday. Mr. Roller pled guilty to two counts of second degree murder and was sentenced to life imprisonment without parole. When the

*Miller/Montgomery* cases were decided, prisoners were unsure how to proceed. Mr. Roller challenged his own sentence and was released from custody in 2015.[8]

At Angola, Mr. Roller heard of Defendant years before they met. He testified, "Older guys were referencing [Defendant] in my efforts to do the right thing all the time." They told Mr. Roller that Defendant had "influenced hundreds and hundreds of people to do the right thing. And just the way he lives, his conduct."

A prisoner had to be trusted to work in the dog pen. After twenty years of imprisonment, Mr. Roller "was considered a pretty model prisoner" and got the chance to live in the dog pen area, where no guards watched them at night. Mr. Roller had twenty-seven writeups during those twenty years, which he explained was "still considered a very model prisoner." He learned Defendant "had one minor rule infraction that the sentence was suspended" some years prior. Mr. Roller said ".003 percent of the [Angola] population" lives at the dog pen,

---

[8]Mr. Roller's testimony included the facts of his case. His earliest memories were of his father abusing his mother and of his own serious medical issues that resulted from living in a home with those traumatizing events. He was found to have a learning disability in the second grade, and he learned later "it's all related to trauma" that "can just retard certain areas."

When questioned about the murders, Mr. Roller testified he never really formally planned to commit them. He commented, "My anger toward my father had been building with his abuse. My stepmother was not really a part of this." He planned to go to his room, shut the door, and wait for them to leave. He "got scared of [his] father and thought, I can never make it down that hall, I'm going to get a gun and go to my room." He still could not "make it down the hall[,]" and he went into his bathroom, where he sat in the dark. He shot his stepmother when she turned on the bathroom light and screamed; he exited the bathroom and was trapped by his father at the end of the hall. He shot his father also. Mr. Roller said he got the gun because he "was just terrified." The entire unplanned episode happened "awfully fast." His attorney, a close family friend, told him to plead guilty to second degree murder with sentences of life without parole, and he did.

The trial court allowed Mr. Roller to withdraw his guilty pleas to second degree murder and plead guilty to manslaughter. Additionally, the sister of Mr. Roller's stepmother and others in her family spoke in his favor, and the State did not oppose the motion. Mr. Roller served twenty-seven years of his original LWOP sentences in prison. This court has not adopted the practice of reducing a *Miller* defendant's charge to manslaughter. *See State v. Comeaux,* 17-682 (La.App. 3 Cir. 2/15/18), 239 So.3d 920, *writ denied*, 18-428 (La. 1/14/19), 261 So.3d 783.

representing fifteen beds of the more than sixty-three hundred inmates. A prisoner obtains that position based on "character, trustworthiness, and work ethic."

Mr. Roller's experience at Angola was that doing the wrong thing helped him "get along with the fellows better." Doing the right thing made a prisoner "stick out in a way you don't want to stick out among some very dangerous people that love mischief." Mr. Roller considered Defendant to be a role model to do the right thing, "the kind of guy to emulate." He noted:

> When there's no reason to do the right thing . . . and you still do the right thing and you make it a point and you volunteer for extra work to help with dogs or to help cook an event at the Superdome, you know, feeding, you know, disaster victims, when you volunteer for extra work, it's something to emulate. It's the same way in society.

Mr. Roller testified at the hearing because he felt Defendant was deserving based on his "exemplary educational achievements," his conduct, and the trustworthiness of the prison officials. Mr. Roller believed part of the mission of the Department of Corrections was to rehabilitate; he felt Defendant showed rehabilitative efforts "[f]ar more than any person [he had] ever met there."

Mr. Roller commented, "There's some *Miller* applicants at Angola that truly terrify me. They're just scary. They have not done the right thing at all, and their mentality is just terrifying." Defendant was different from those because of his character, trustworthiness, and conduct; he was "what you want to emulate on doing the right thing[.]"

Robert Peters testified he visited Angola for three days in 2009 as part of a Mike Barber Ministries team helping with the "Crunch Bowl" at the prison. He returned a few months later for the rodeo and went to the dog pen, where he met Defendant. At first, Mr. Peters thought Defendant was a prison guard. He described Defendant as "[j]ust [a] super nice guy and just totally unassuming and just as pleasant as he could be. And the friendship was immediate." Defendant

31

"was the only Angola person there at the dog pen." He escorted Mr. Peters and his family around the grounds.

Mr. Peters, his wife, and her parents became pen pals with Defendant. Mrs. Peters wrote to Defendant "at least five times a week." The family has visited Angola every year since 2009 in October for the rodeo and again on Good Friday. They knew the nature of Defendant's crimes from the beginning. Defendant has never asked the family for money or for help with his legal proceedings. The family gives Defendant birthday and Christmas gifts; they consider him a member of their family.

A home and a choice of jobs awaits Defendant if/when he gets out of prison. Mr. Peters recently bought a ranch with a separate apartment for Defendant. He has a used truck at the ranch for Defendant's use. He has "lined up four jobs for [Defendant] that he has a choice of." The Peters' goal is for Defendant to gain parole opportunity and come to Texas to live with them. The family believes Defendant deserves a second chance. Mr. Peters believes Defendant's "heart is pure, his sincerity is pure . . . he's the poster child for trustees." He believes Defendant "with his tremendous positiveness and his tremendous ability . . . he's going to pay back the community . . . and make himself a model citizen and improve his life . . . ."

Lorri Peters agreed with her husband's testimony. She testified Defendant had warned her about inmates who would try to trick Mr. and Mrs. Peters into giving them money. Defendant told them all he wanted was their friendship.

Regarding the murders, Defendant told Mrs. Peters he went to get his belongings. He watched the house and thought no one was home when he saw his dad leave. Mrs. Peters testified Defendant "was shocked to find [John] in his bedroom in his bed; and it just – it just happened . . . It just sent him into shock or

32

anger or rage at the time." She did not "remember little details" like Defendant stealing things from the house or stopping to drink Kool-Aid after the murders. She did not recall anything about Defendant taking a car. What mattered to her was "where he is now."

Mrs. Peters thought Defendant was "a child, running around with somebody that was way too old for him that obviously is not a good person." She thought that had a lot to do with why Defendant entered the house with a .223 assault rifle. She did not believe Defendant went in the house "with the thought of murder." She did not know how Defendant had met Mr. Kinkade.

Mrs. Peters has heard more details of the nature of Defendant's crimes since they first met, but that has not changed her opinion of him at all. She thinks "he has been rehabilitated and reconformed [sic] in Angola." She believes "he's bettered himself." Mrs. Peters believes Defendant deserves a second chance to live outside of prison and said Defendant "[h]as offered up to [her] remorse." She sees Defendant as "a changed person." Mr. and Mrs. Peters have even discussed adding Defendant to their wills, and they want him to be a part of their family. Mrs. Peters' parents call Defendant their son, and he calls them Grandma and Grandpa.

Defendant was the last to testify. He understood the hearing was about the *Miller/Montgomery* rulings "that even children who commit heinous crimes are capable of change . . . have a greater propensity for rehabilitation and if during their years of incarceration they've shown maturity, they must be afforded a meaningful opportunity for release."

Defendant did not think a juvenile could understand the implications of what he had done, taking "not just two people's lives, but . . . someone's mother, someone's brother, son." He testified, "I'm not the same person, and I'm so sorry for what happened." He realized what he did not only took two people's lives, it

33

also "ruined the lives of the people that loved them, even the lives of the people that loved me."

After his arrest, Defendant said he tried to write his father several times and even crocheted "a little hat to send him." He never received a reply. Defendant felt he had made peace with Raymond Leidig after receiving his letter of forgiveness.

At the time of the hearing, Defendant's sister was receiving treatment for leukemia at M.D. Anderson, and his mother had been injured in a recent fall. Neither was able to attend the hearing, but Defendant's sister wrote a letter in his favor.

At Angola, Defendant had one conduct writeup around 1986 or 1988 for "not working fast enough." He received a reprimand that was suspended. He had no other disciplinary issues since that time.

After a few years at Angola, Defendant began taking correspondence courses. He passed five courses in anger management; finished the automotive technology school; and passed "the ASE certifications for engine repair, electrical electronic systems, automatic transmissions, manual transmissions, engine performance, [and] the H-back test." He went through the cooking school and completed numerous other educational programs.

Defendant was featured in a documentary filmed at Angola at the dog pen where he worked. He volunteered for that project "because everything that you see on TV about prison and prisoners is not always true. There's not all that drama." He wanted to show "there are a lot of people who are in prison that have really tried to rehabilitate themselves and do the right thing, regardless of what they've done in the past, regardless of how terrible of a crime they've committed." Defendant felt he "would be a good candidate for that." He said he accepted full

responsibility for what happened, was sorry, wished it had never happened, and wished he "could go back and do things differently."

About forty hours of filming the documentary video at the dog pen at Angola was edited to thirty to forty-five minutes. It did not show Defendant displaying any remorse for the murders, even though Defendant testified they "did pretty lengthy interviews at different times about all of that[.]" The warden had "the final say-so as to what was actually – what would actually be aired."

Defendant first went to the dog pen in 1996. He left for a while when he was accepted into the automotive technology school. He gets up at 2:00 a.m. to check on the animals. Some days are very long and do not end until 7:00 p.m. Defendant tries "to be a role model for some of the guys who've just come there and are still trying to find their niche." He has been "a minimum A class trustee[,]" a classification not easily earned, since the summer of 1992. He does not have to be behind a fence; he can go anywhere on the prison grounds without supervision. He believes he has been rehabilitated and could rejoin society.

Defendant met a woman as a pen pal and eventually married her, but "it didn't last, like most prison relationships[.]" He never sought therapy as a result of the assault in the Navy because he did not want anyone to know about it. He might possibly be willing to undergo therapy, but he was not sure about the benefit because the assault happened so long ago. He believes he has done a lot in thirty-five years to overcome that incident. Defendant thinks the only thing he can do "is try to live [his] life in a way that would honor the victims, if there's ever such a thing."

On cross-examination, Defendant confirmed he takes full responsibility for what he did. However, he then testified "there were a lot of things that were contributing factors to it." He agreed he blamed his immaturity, and he said at the

35

time he "didn't know the far-reaching implications of what taking somebody's life actually means." He felt his father did not love him and did not treat him right. He no longer feels that way and is no longer angry with his father. He acknowledged he could have turned around and left the house when he saw Joan. In contrast to the autopsy report, Defendant said Joan never saw him, and she was not looking at him when he shot her on her right cheek slightly below her eye. Again, although the autopsy report showed a second shot to the right side of the chest, Defendant testified he did not remember Joan facing him. He thought he shot her in the back.

Defendant likewise did not remember John looking at him even though the autopsy report showed one wound on the right side of the head beneath the right eye and another wound through his right forearm, as though he put his arm up to block the shot. Although Defendant would not say he committed the murders because he was raped in the Navy, he thought "everything has a bearing on the actual events that took place." He accepted responsibility for his acts, but he wanted a new beginning, a second chance. He asked the court to consider his youthfulness and the facts and circumstances. Defendant testified he harbored growing anger from around age ten to the time of the murders toward his father "[t]o an extent[,]" and his mother probably fueled that anger by telling him "different stories that had happened to her." Defendant said he feels no anger about being in custody; if he has anger, it is at himself because he could have done something better with his life.

Although Defendant knew of a prison rule that he could not contact relatives of victims, Defendant said he wrote to Dr. Leidig and to his father. He testified Dr. Leidig lied when he said Defendant responded to his letter and cursed him. Defendant said he actually thanked Dr. Leidig for writing him, told him he was sorry, and asked for forgiveness. He thought Dr. Leidig would have kept any letter

Defendant had written him that "cussed him out and called him every other name," and he thought it suspicious that Dr. Leidig told no one about the supposed letter.

The trial court asked Defendant what he considered to be a proper punishment for taking two lives. Defendant responded, "if it was my loved one, I would want their life for it." He questioned whether the purpose of incarceration was punitive or rehabilitative, and he asked about the purpose of continued incarceration if "children who have committed heinous crimes are capable of change." Defendant did not see much difference between someone eighteen years old and another person one day younger except that the courts draw the line at age eighteen. He commented, "until our laws change or until our country, our cultures decide to take that issue up, we're stuck with the United States Supreme Court recognizing a juvenile as anyone under the age of 18." Defendant reiterated he thought "anybody is capable of change."

Assistant Warden Jonathan London wrote a character reference letter at Defendant's request dated September 9, 2016. Assistant Warden London considered Defendant "a hard worker . . . a decent man at the core." He noted Defendant's dedication to the K-9 program. He explained inmates assigned to the dog pen "are carefully selected and highly trusted[.]" They are assigned to "the lowest security housing area on Penitentiary grounds . . . [and] are often called upon to perform numerous special projects on and off Penitentiary grounds." Assistant Warden London also noted Defendant had "taken advantage of many educational and self-help programs" offered at Angola.

Lieutenant Colonels Johnny Dixon and Joe Norwood, Jr. also wrote a character reference letter. They explained Defendant was assigned to the K-9 training center in October of 2001. Defendant "has awesome culinary skills and

takes pride in the meals he prepares for the Dog Pen workers and staff." He keeps the kitchen "always clean, neat and kept to the highest sanitation codes."

Defendant's attention and caring attitude toward the dogs has identified medical problems with them, and he has summoned help through proper channels during off-duty hours that has saved the lives of these valuable dogs. He has worked long hours and performed extra duties. He has also volunteered to help in emergency situations such as floods and hurricanes. Importantly, the Lieutenant Colonels stated, "During the fifteen years [Defendant] has worked under our supervision, we have never seen him lose his temper. [Defendant] is always easy going and calm natured."

Defendant's sister Robin wrote the court noting Defendant had applied himself in prison, achieved multiple accomplishments, and shown "his responsibility capabilities." She felt his conduct in prison showed "he can and does conform to rules and regulations, changing his life for the better."

Still others – pen pals – have written the trial court with laudatory words about Defendant. They spoke of how Defendant was completely open with them about his crimes and of how their relationships with him have changed their lives for the better. The letters spoke highly of Defendant's character, his positive nature, and his attitude of hope even in an environment of life without the possibility of parole.

Another letter from a prison ministry associate, Kevin Miller, noted he felt safe with Defendant and others who worked at the dog pen. He believed Defendant is not the same person now that he was as "a kid." He agreed with Defendant's original LWOP sentence, but he also agreed with the Supreme Court that a juvenile should not be punished as an adult. Mr. Miller stated, "No one can

have a track record in a glass house as impressive as [Defendant's], and especially not for 35 years, and still make bad decisions he did as a youth."

Nevertheless, numerous people wrote to the trial court asking for Defendant to be denied parole. Some of the letters spoke of the horrendous crimes and the loss of the victims. Others simply stated they were opposed to Defendant being granted the opportunity of parole and/or being released from prison. Some of the writers mentioned they had heard Defendant was rehabilitated but were nevertheless strongly opposed to his eligibility for parole and to his release from prison.

In *State v. Williams*, 50,060 (La.App. 2 Cir. 9/30/15), 178 So.3d 1069, *writ denied*, 15-2048 (La. 11/15/16), 209 So.3d 790, the seventeen-year-old defendant fired fifteen rounds from a military assault weapon into a house where seven people were asleep. He bragged about the shooting, not knowing his intended victim was not in the house. One of the people inside the house was wounded, and an eighteen-month-old child was killed in his playpen.

The defendant was sentenced to LWOP; *Miller* was decided while his conviction and sentence were on appeal. At the *Miller* hearing, evidence showed the defendant compiled a lengthy disciplinary record while he was in jail awaiting trial. He refused to follow rules; he cursed and threatened deputies. The trial court again sentenced the defendant to LWOP. The second circuit affirmed the sentence noting the defendant was one of the worst offenders in one of the worst cases.

Likewise, the seventeen-year-old defendant in *State v. Alridge*, 17-231 (La.App. 4 Cir. 5/23/18), 249 So.3d 260, *writ denied,* 18-1046 (La. 1/8/19), 259 So.3d 1021, stabbed a fifteen-year-old boy forty-nine times, wrapped his face in

duct tape, and left his body covered with plastic in an abandoned house.[9] He was sentenced to LWOP. Testimony at the defendant's *Miller* hearing showed his juvenile record included possession of a contraband cell phone, obscenity, and two counts of battery of a correctional officer while he was in jail awaiting trial for the murder. The defendant "was on the highest security classification within the prison system[,]" which required him to be locked down for twenty-three hours a day. *Id.* at 289. His hands and legs were restrained during the one hour he was allowed out of his cell. This security level indicated the defendant was "one of the most dangerous inmates in Orleans Parish Prison[.]" *Id.*

The trial court noted the heinous nature of the crime and found no mitigating circumstances. The court further found the defendant's conduct did not represent impulsive behavior. The fourth circuit affirmed the LWOP sentence.

The seventeen-year-old defendant shot and killed a homeless crack addict in *State v. Smoot*, 13-453 (La.App. 5 Cir. 1/15/14), 134 So.3d 1, *writ denied,* 14-297 (La. 9/12/14), 147 So.3d 704. The trial court noted the defendant came from a broken home, was raised by his grandfather, and had received psychiatric treatment and counseling while he lived in group homes and Boys Town from the age of twelve to fifteen. The defendant was serving a sentence for possession of cocaine with the intent to distribute at the time of his murder trial. He also had a prior arrest for second degree murder, but the charge was refused when witnesses would not testify. The trial court noted the particularly heinous nature of the crime and found the defendant's youth to be the only mitigating circumstance. The fifth circuit affirmed the sentence.

---

[9]The defendant filed a petition for *certiorari* with the Supreme Court, which distributed the case for conference on October 1, 2019. The Court has not yet indicated whether it will grant or deny the writ application.

In *State v. Brooks*, 49,033, p. 1 (La.App. 2 Cir. 5/7/14), 139 So.3d 571, 573, *writ denied,* 14-1194 (La. 2/13/15), 159 So.3d 459, the defendant was four months away from turning eighteen and a member of one of two gangs who "had long been having a turf battle" over an apartment complex. He fired an assault rifle at rival gang members as they ran away from him and his brother, who was firing a pistol. The victim was a fifteen-year-old innocent bystander. Evidence indicated the fatal shot may have been fired from a handgun rather than from the assault rifle the defendant fired. The defendant showed no remorse or explanation for the "senseless murder" and failed to comprehend that he had escalated the situation and endangered many lives. *Id.* at 575.

The defendant's mother had drug problems and was frequently incarcerated; his father had not been involved in his life and sold and used drugs. The defendant had problems in school and dropped out at age fourteen. The fifth circuit affirmed the trial court's imposition of a LWOP sentence.

On the other hand, in 1994, the juvenile defendant pled guilty to second degree murder in *State v. Young*, 18-564 (La.App. 1 Cir. 11/5/18) (unpublished opinion), *writ denied,* 18-1968 (La. 5/20/19), 271 So.3d 201. He and other occupants of a vehicle had opened fire and killed a bicyclist. At the defendant's *Miller* hearing, the trial court resentenced the defendant to life imprisonment with the possibility of parole pursuant to La.Code Crim.P. art. 878.1 and La.R.S. 15:574.4(G).

In this case, we find Defendant has a great advantage over the defendants denied parole eligibility in the cases discussed above by virtue of his thirty-five-year history of model behavior. While Defendant's crimes seem every bit as heinous as the cases denying parole eligibility, he has the benefit of history that has shown tremendous evidence of rehabilitation. Defendant has compiled a stellar,

41

model, and exemplary prison record. None of the evidence offered at the resentencing hearing suggested Defendant has not been rehabilitated. Again, the Supreme Court emphasized that "[t]he opportunity for release will be afforded to those who demonstrate the truth of *Miller's* central intuition—that children who commit even heinous crimes are capable of change." *Montgomery*, 136 S.Ct. at 736. The Supreme Court held in *Miller* that:

> [C]hildren are constitutionally different from adults for purposes of sentencing. Because juveniles have diminished culpability and greater prospects for reform, . . . 'they are less deserving of the most severe punishments.' . . .
>
>     . . . .
>
> That is especially so because of the great difficulty we noted in *Roper* and *Graham* of distinguishing at this early age between "the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption."

*Miller*, 567 U.S. at 471, 479-80, (citing *Roper v. Simmons*, 543 U.S. 551, 573, 125 S.Ct. 1183, 1197 (2005), and *Graham v. Florida*, 560 U.S. 48, 68, 130 S.Ct. 2011, 2026-27 (2010)). *Miller* also found the "appropriate occasions for sentencing juveniles to the harshest possible penalty will be uncommon." *Miller*, 567 U.S. at 479. We find that Defendant's prison record and evidence of rehabilitation have demonstrated he is not irreparably corrupt.

Defendant presented evidence that the brains of juveniles are not mature at the point that he committed these murders. He presented evidence of a traumatic physical and sexual assault a few months prior to these murders that possibly increased feelings of resentment and colored his judgment.

None of this evidence excuses or condones Defendant's crimes. However, it does show Defendant has matured in prison, has demonstrated model behavior in spite of a most difficult environment, has developed positive relationships, and has

the opportunity for a successful future outside of prison if he is ever able to achieve parole. The standard of review in a sentencing matter is whether the trial court abused its discretion, and this court should not set aside Defendant's sentence absent an abuse of discretion. *Alridge*, 249 So.3d 260. Based on our review of the record, and in light of *Miller* and *Montgomery*, we conclude that the trial court abused its discretion in denying Defendant's motion to correct his illegal sentence. Accordingly, we reverse the trial court's judgment, and we resentence Defendant to two concurrent sentences of life imprisonment with the possibility of parole.

Because we have determined that the trial court abused its discretion in denying Defendant the opportunity for parole, we need not address Defendant's remaining assignments of error.

**DECREE:**

For the foregoing reasons, we find that the trial court erred in denying Defendant the opportunity for parole. Defendant has provided sufficient evidence to show he is not irreparably corrupt and is entitled to resentencing to two concurrent life sentences with the possibility of parole. Accordingly, we reverse the trial court judgment and resentence Mr. Aaron Hauser to two concurrent sentences of life imprisonment with the possibility of parole.

**REVERSED.**